## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

JESSICA BARRON, KENNETH WYLIE,
and WILLIAM CAMPBELL,

<em>Plaintiffs,</em>

v.

THE CITY OF GRANITE CITY, ILLINOIS,

<em>Defendant.</em>

Case No. 3:19-cv-834

_____

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
_____

### INTRODUCTION

1.     This civil-rights lawsuit challenges a Granite City ordinance that forces private landlords to evict law-abiding tenants as punishment for other people's crimes.

2.     Plaintiffs Jessica Barron and Kenneth ("Kenny") Wylie have lived in their home, at 1632 Maple Street, for the past two years. They intend to purchase the home for themselves and their three teenage children; each month, they make payments toward the purchase price to the current owner, co-plaintiff William ("Bill") Campbell. This arrangement is known as a real estate installment contract, and it is common for people who do not qualify for a traditional mortgage.

3.     Jessica, Kenny, and Bill all are satisfied with this arrangement. But Granite City is trying to coerce Bill into declaring the contract void and evicting Jessica and Kenny's family from their home. Over the past month and a half, Granite City police have repeatedly called Bill to insist that Jessica and Kenny "have to go." On one occasion, an officer confronted Jessica at

city hall and declared that he was "personally" evicting her. That same officer threatened to arrest Bill for not commencing an eviction suit. On two occasions, officers have even pounded on Jessica and Kenny's door to serve compulsory-eviction demands.

4.     The basis for the City's campaign is not that Jessica and Kenny have done anything wrong; it is that a friend of their sixteen-year-old son broke into a restaurant elsewhere in town. Because the friend often spent time at Jessica and Kenny's home, the City has invoked its compulsory-eviction law and demanded that Bill evict Jessica, Kenny, and their children. Under the law, the City coerces private landlords to evict entire families if any member of the household—or even a guest—commits a crime anywhere within city limits (or, sometimes, anywhere at all). It is no defense that the tenants had nothing to do with the crime. Here, in fact, police caught the restaurant burglar only after Jessica discovered him in her home, alerted the police, and helped the officers arrest him. Even so, the City wants Jessica gone, and Kenny gone, and their children gone because of someone else's misdeed. This effort to make an innocent family homeless violates the federal Constitution at a bedrock level, and for that reason Plaintiffs seek relief in this Court.

## JURISDICTION AND VENUE

5.     Plaintiffs Jessica Barron, Kenneth Wylie, and William Campbell (collectively, the "Plaintiffs") bring this civil-rights lawsuit under the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.     Plaintiffs seek declaratory and injunctive relief against enforcement of the City of Granite City's compulsory-eviction law, Granite City Municipal Code §§ 5.142.010 *et seq.* (the "compulsory-eviction law").

7.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202 and 42 U.S.C. § 1983.

8.      Venue lies in this Court under 28 U.S.C. § 1391.

## PARTIES

9.      Plaintiff Jessica Barron is a citizen of the United States and a resident of the City of Granite City, Illinois.

10.     Plaintiff Kenneth ("Kenny") Wylie is a citizen of the United States and a resident of the City of Granite City, Illinois.

11.     Plaintiff William ("Bill") Campbell is a citizen of the United States and a resident of Pontoon Beach, Illinois.

12.     Defendant City of Granite City, Illinois ("Granite City" or "City") is a municipal entity organized under the constitution and laws of the State of Illinois. Defendant is located at 2000 Edison Avenue, Granite City, Illinois.

## FACTUAL ALLEGATIONS

13.     Under its compulsory-eviction law, Granite City uses the threat of governmental sanctions to coerce private landlords to evict private tenants who have done nothing wrong.

**A.      "He is guilty if I say he's guilty": Granite City's compulsory-eviction law**

14.     In 2013, the *St. Louis Business Journal* asked Brian Konzen to identify the "[m]ost controversial issue you've worked on" during his many years as city attorney for Granite City. His answer: the "crime-free housing program." Julie Murphy, *Beyond zoning: St. Louis area attorneys see it all*, St. Louis Bus. J., Sept. 27, 2013.

15.     Benign in label, Granite City's "crime-free housing program" is deeply unconstitutional in practice. In truth, it is a compulsory-eviction law. Under it, the City can—and

does—coerce private landlords to evict entire families from their homes based on crimes committed by other people at other places.

16.     First enacted in 2006, Granite City's compulsory-eviction law applies to all rental properties located within the corporate limits of Granite City. The law also applies to certain properties that are subject to a "contract for deed" (also known as an installment contract). Granite City Mun. Code § 5.142.010.

17.     Granite City's compulsory-eviction law is not limited in its application to public housing.

18.     Granite City's compulsory-eviction law is not limited in its application to rental properties that are subsidized with governmental money.

19.     Rather, Granite City's compulsory-eviction law applies to private landlords, renting private property to private tenants who pay their rent with privately earned income.

20.     Landlords are subject to governmental sanctions if they violate the compulsory-eviction law. These governmental sanctions include monetary fines and suspension or revocation of their business license.

21.     Among the violations that can give rise to governmental sanctions are the following:

> The failure of the licensed lessor to take prompt, diligent and lawful steps to remove the lessees from possession of the rental unit;
>
> a.     Following notice of the commission of a felony in the rental unit where allowed or permitted by lessee, or
>
> b.     Following notice of four ordinance violations in the residential rental unit, where allowed or permitted by lessee, or
>
> c.     Following notice of other violation of the crime-free housing lease addendum, exhibit B, as now or as hereafter amended, where violation of that lease addendum expressly constitutes good cause for termination of the lease.

*Id.* § 5.142.050(A)(3).

22.     The addendum referenced in Section 5.142.050(A)(3)(c) proscribes all manner of criminal offenses committed by tenants, members of their households, or guests—not just on the rental property, but elsewhere too. (A true and correct copy of the "Lease Addendum for Crime Free Housing" is attached to this complaint as Exhibit 1.) For example, the addendum provides:

   a.     The "Lessee or any member of lessee's household, shall not engage in criminal activity, including drug-related criminal activity, within the city limits of the City of Granite City." Lease Addendum for Crime Free Housing ¶ 1.

   b.     The "Lessee or members of lessee's household, <u>shall not engage in any act intended to facilitate criminal activity,</u> including drug-related criminal activity within the city limits of the City of Granite City." *Id.* ¶ 3 (emphasis in original).

   c.     The "Lessee, or a member of lessee's household, shall not engage in any criminal activity found to be equivalent to a Forcible Felony at any location, on the property premise or otherwise." *Id.* ¶ 8.

23.     Moreover, it is Granite City's policy and practice to expand certain of these addendum provisions even further. For example, the addendum provides that neither the lessee nor "members of lessee's household" shall engage in any act intended to facilitate criminal activity within city limits. *Id.* ¶ 3. But in compulsory-eviction demands, the City has also asserted that it is enough for a "Lessee's guest" to have engaged in such an act.

24.     The addendum further provides that "a single violation of any of the provisions" in the addendum "shall be good cause for termination of lease." *Id.* ¶ 9.

25.     The addendum is not a "lease addendum" as most people would understand that phrase. Neither landlords nor tenants are free to negotiate or opt out of the addendum. Rather, the City mandates that landlords and tenants sign the document as a condition of receiving their occupancy permits. Even that is an empty act; if no one were to sign it, the addendum still would apply. By law, "[e]very agreement for lease of residential real estate located within the corporate limits of the city of Granite City . . . shall be deemed to include all terms listed on the lease addendum." Granite City Mun. Code § 5.142.060.

26.     In this way, Granite City's compulsory-eviction law differs fundamentally from the type of program recommended by the original developer of crime-free housing programs. Earlier this year, the founder and executive director of the International Crime Free Association Inc. "said his association recommends cities implement voluntary programs, not mandatory ones." Garrett Bergthold, *ACLU challenges Adelanto's crime-free rental law*, The Daily Press (Mar. 19, 2019), https://tinyurl.com/y5w4cflx.

27.     Not only are landlords and tenants automatically "deemed" to have acquiesced to the addendum, but landlords are required by law to enforce the addendum whenever the City demands that they do so. As described above, a landlord is required by law "to take prompt, diligent and lawful steps to remove the lessees from possession of the rental unit" upon the City's notifying the landlord of any "violation of the crime-free housing lease addendum." Granite City Mun. Code § 5.142.050(A)(3)(c).

28.     The end result of Granite City's compulsory-eviction law is that landlords are required by law to evict entire families whenever the City claims that any member of a tenant's "household" has (1) "engage[d] in criminal activity" anywhere in Granite City, (2) "engage[d] in any act intended to facilitate criminal activity" anywhere in Granite City, or (3) committed a

"forcible felony" anywhere at all. *See* Lease Addendum for Crime Free Housing ¶¶ 1, 3, 8; *see also* Granite City Mun. Code § 5.142.050(A)(3)(c).

29.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction because the lessee was innocent of any wrongdoing.

30.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction because the lessee was not involved in the alleged criminal activity.

31.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction because the lessee was unaware of the alleged criminal activity.

32.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction because the alleged criminal activity took place at a location other than the rental property.

33.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction because the alleged criminal activity had no connection to the rental property.

34.     If the City demands that a landlord evict a lessee under the compulsory-eviction law, the landlord does not have discretion to forgo eviction for any reason at all.

35.     When the City claims that a predicate crime has taken place under the compulsory-eviction law, the landlord has no choice but to evict the entire family living at the rental property or face revocation or suspension of his license. At the same time, however, nothing in the compulsory-eviction law prevents the same landlord from renting any other

property in Granite City to the same evicted tenants. Nor does the compulsory-eviction law prevent any other landlord from renting any other property in Granite City to those tenants.

36.     Before Granite City may take action to revoke or suspend a landlord's business license under the compulsory-eviction law, the ordinance provides that certain procedures "shall be followed." Granite City Mun. Code § 5.142.080. "Simultaneously with the service of any request made upon a landlord for implementation of eviction or other proceedings to terminate a residential lease," Granite City must serve upon both "the landlord and the tenant" a notice containing the following information:

    a.     A copy of the compulsory-eviction law;

    b.     The address of Granite City's building and zoning administrator; and

    c.     "[F]acts alleging the grounds for revocation or suspension of the lessor's or landlord'[s] license."

*Id.* § 5.142.080(A).

37.     Upon receipt of this information, either the landlord or the lessee may file a written grievance with the building and zoning administrator "within fifteen days of the date stated on the notice served." *Id.*

38.     If either the landlord or the lessee invokes the grievance process, the City is required to schedule a hearing. *Id.* § 5.142.080(B).

39.     At the hearing, "[t]he hearing officer's decision shall be limited to the question whether the landlord must begin eviction proceedings against the tenant." *Id.* § 5.142.080(M).

40.     At the hearing, the landlord or the lessee "must first make a showing of an entitlement to the relief sought." *Id.* § 5.142.080(J). Only "thereafter" must the City "sustain the burden of justifying the action or failure to act against which the grievant is directed." *Id.*

41.     At one such hearing, on information and belief, a high-ranking officer with the Granite City Police Department demanded that a pregnant woman be evicted based on an offense allegedly committed by her fiancé. The police officer, on information and belief, justified the City's position on the following ground: "he is guilty if I say he's guilty."

42.     There is no requirement in Granite City's compulsory-eviction law that the City prove that the lessees were complicit in a household member's or guest's criminal activity.

43.     There is no requirement in Granite City's compulsory-eviction law that the City prove that the lessees were aware of a householder member's or guest's criminal activity.

44.     For many offenses, there is no requirement in Granite City's compulsory-eviction law that the City prove that the predicate criminal activity occurred at the lessees' home.

45.     It is not a defense to enforcement of Granite City's compulsory-eviction law that no lessee was complicit in the criminal activity of a household member or guest.

46.     It is also not a defense to enforcement of Granite City's compulsory-eviction law that the lessees were unaware of the criminal activity of a household member or guest.

47.     For many offenses, it is not a defense to enforcement of Granite City's compulsory-eviction law that the predicate criminal activity occurred at a location other than the lessees' home.

48.     In fact, of the more than 300 compulsory-eviction demands Granite City has issued between 2014 and today, more than one hundred cite crimes—from shoplifting to driving with a revoked license—that did not take place at the rental property targeted for eviction.

**B.     Jessica Barron, Kenny Wylie, and their children**

49.     Jessica Barron and Kenny Wylie were born and raised in Granite City. They have been in a committed relationship for the last 18 years and have three teenage children. Their two sons attend public high school in Granite City; their daughter goes to the local middle school. When summer break ends later in August, the children will return to their schools in Granite City.

50.     Kenny works as a forklift operator, and Jessica is struggling to find work as a housekeeper.

51.     For the past two years, Jessica, Kenny, and their children have lived in a modest house at 1632 Maple Street, in Granite City.

52.     Below is a true and correct photograph of Jessica and Kenny's home, taken on July 30, 2019:



53.     Jessica and Kenny are in the process of buying the house at 1632 Maple Street under an installment contract with Bill Campbell, who owns the property. Jessica and Kenny

both are named as parties to the contract. Each month, they pay Bill an installment toward the final purchase price of the home. This is an arrangement common for people who do not qualify for a traditional mortgage.

54.     For the past two years, Jessica and Kenny have paid monthly installments to Bill, with the aim of ultimately owning their home at 1632 Maple Street.

55.     Bill wants Jessica and Kenny to be able ultimately to buy 1632 Maple Street from him.

56.     Like Jessica and Kenny, Bill has lived in the area for most of his life. He currently owns around 15 properties in Granite City. In part because he is looking to retire, many of his properties are leased on a rent-to-own basis.

57.     Jessica and Kenny have an open-door policy when it comes to their children's friends. Many teenagers in Granite City come from troubled backgrounds, and Jessica and Kenny view their home as a safe zone for kids who are having difficulties with their families or who are otherwise struggling.

58.     For a time, Jessica and Kenny fostered Jessica's nephew. In fact, Kenny is certified to be a foster parent with family services.

59.     Although Jessica and Kenny do not foster children currently, it is not uncommon for their teenagers' friends to come by for a meal, or to have Jessica do their laundry, or to spend the night.

60.     In the fall of 2018, Jessica and Kenny's eldest son (now sixteen) befriended an eighteen-year-old boy named Jason Lynch.

61.     Jason Lynch did not have a permanent residence in the area; in Jessica and Kenny's understanding, he had recently come from Rolla, Missouri.

62.     At first, Jason Lynch told Jessica and Kenny that he was homeless and that his mother had died. Jessica and Kenny later learned that Jason Lynch's mother was alive.

63.     Like other friends of Jessica and Kenny's children, Jason Lynch sporadically spent time at their home during the fall of 2018. During that time, he would sometimes spend the night.

64.     Once it got cold out, around January 2019, Jason Lynch started spending more nights at Jessica and Kenny's house. During this time, his movements remained irregular, but he would often sleep at least a few nights a week at Jessica and Kenny's house. At no point was Jason Lynch named on the contract between Bill and Jessica and Kenny. Nor did Jessica and Kenny have any obligation to offer Jason Lynch shelter.

65.     On information and belief, Jason Lynch broke into a restaurant in Granite City on the night of May 21, 2019.

66.     Neither Jessica nor Kenny had anything to do with Jason Lynch's crime.

67.     At around 6:00 A.M. the following morning, Jessica encountered Jason Lynch in her home. She was not aware of his burglary the night before. But she told him to leave the house because he was carrying bottles of beer.

68.     While returning from her sister's house later that day, Jessica was approached outside her home by an officer with the Granite City Police Department.

69.     The police officer informed Jessica that Jason Lynch was suspected of having burglarized a restaurant the night before.

70.     This was the first Jessica had heard of the burglary.

71.     The police officer asked Jessica whether Jason Lynch was inside her home. Jessica (accurately, she thought) said he was not.

72.     Upon entering her home minutes later, Jessica found that Jason Lynch had in fact returned. Jessica quietly told her younger son to run down the street and alert the police officer. He did so, and with Jessica's consent, several police officers entered her home. Jessica led the officers into her basement and directed them to a crawlspace where Jason Lynch was hiding. As the officers removed Jason Lynch from the house, one of the officers thanked Jessica and reassured her that she had done the right thing by contacting them.

73.     On information and belief, on the day of Jason Lynch's arrest, the State of Illinois charged him with one count of burglary, a state-law felony.

74.     On information and belief, on May 31, 2019, Jason Lynch pleaded guilty to the burglary count.

75.     On information and belief, the Madison County Circuit Court sentenced Jason Lynch to probation and ordered him released.

76.     Jason Lynch showed up at Jessica and Kenny's house a couple of times after his May 22 arrest. But even before learning of the City's compulsory-eviction demand, Jessica told him to stop coming to their home, and he stopped.

**C.     "These people need to go": Granite City's campaign to evict Jessica, Kenny, and their children from their home.**

77.     On or around June 18, 2019, Lieutenant Mike Parkinson—Granite City's "Crime Free Multi-Housing Officer"—called Bill Campbell (the owner of Jessica and Kenny's house) on the phone.

78.     Lieutenant Parkinson instructed Bill to evict Jessica, Kenny, and their children. Lieutenant Parkinson told Bill about the incident with Jason Lynch and said the entire family would "just have to go."

79.     At that time, Granite City had not served Bill with a compulsory-eviction demand under Section 5.142.080 of the Granite City Municipal Code.

80.     Bill does not want to evict Jessica and Kenny from their home for Jason Lynch's crime.

81.     Bill thinks Granite City's compulsory-eviction law is unjust and unconstitutional.

82.     Bill thinks Jessica and Kenny had nothing to do with Jason Lynch's misconduct.

83.     Bill knows that Jessica and Kenny are good tenants.

84.     Bill believes that evicting Jessica and Kenny would cause serious hardship for them and their children.

85.     Rather than evict Jessica and Kenny outright, Bill sent them a 30-day notice. He informed them of Lieutenant Parkinson's eviction demand, but he acknowledged that "I know how hard you worked to get your payments back on time" and that "I also suspect that your intentions are good." Bill's letter told them to keep the property in good shape and make sure Jason Lynch no longer comes to the house. Jessica promptly contacted Bill and confirmed that these issues had been resolved.

86.     A week later, on June 24, 2019, Jessica attended a hearing at city hall in Granite City. The purpose of that hearing was to address two citations, one involving overgrown grass in her yard and the other involving an allegedly misplaced sump pump.

87.     While speaking to a city official about her grass and sump pump, Jessica was confronted by a uniformed officer of the Granite City Police Department.

88.     On information and belief, the police officer's surname is Bernard.

89.     The officer asked Jessica whether she had been evicted from her home yet.

90.     Jessica had no idea what the officer was talking about, and told him as much.

91.    The officer informed Jessica that she was subject to eviction because Jason Lynch had committed a burglary. In response, Jessica explained that she had alerted the authorities to Jason Lynch's whereabouts and had let police officers into her home to arrest him.

92.    The officer nonetheless declared that he was "personally" evicting Jessica and that he intended to arrest Bill Campbell for not instituting eviction proceedings.

93.    A day later, the same officer knocked on Jessica's front door and served her with a notice under Granite City's compulsory-eviction law.

94.    A true and correct copy of the compulsory-eviction demand Jessica received is attached to this complaint as Exhibit 2.

95.    The demand was sent from Lieutenant Mike Parkinson and was directed to "Jason S. Lynch, Jessica M. Barron, Kenneth R. Wylie."

96.    The letter first stated in general terms that

It is my understanding:

A)    There is evidence of either the commission of a felony in your rental unit allowed or permitted by your lessee, or four Ordinance violations in your residential rental unit, or in common areas related to your rental unit, within the past six (6) months. Or,

B)    It is my understanding there is evidence your Lessee or Lessee's guest engaged in acts intended to facilitate criminal activity, including drug related criminal activity, within the city limits of Granite City. Or,

C)    It is my understanding your Lessee, guest, or person under your Lessee's control, engaged in the manufacture, sale, possession or distribution of illegal drugs, near the leased premises or otherwise.

97.    The letter also stated (with capitalization altered):

On May 21st, 2019 officers of the Granite City Police Department responded to Ernie and Andy's, 935 Niedringhaus Ave. in reference to a business burglary. The Investigation lead to the arrest of Jason S. Lynch who resides at 1632 Maple Ave. On May 22nd, 2019 Jason S. Lynch was formally charged with Burglary, a

> Class 2 felony, Madison County felony warrant 2019CF001675.
> Since this felony incident occurred in the City of Granite City, it
> is a direct violation of the Granite City Crime Free Multi Housing
> Ordinance and a violation of the Crime Free Multi Housing Lease
> Addendum. This violation requires that an eviction notice be
> served and the eviction process initiated.

98.     Although the compulsory-eviction demand was dated May 23, 2019, Jessica and
Kenny did not receive it until June 25, 2019.

99.     The City did not serve Bill with the compulsory-eviction demand until nearly
another month had passed.

100.    On July 17, 2019, Lieutenant Parkinson left Bill a voicemail insisting that Bill
move forward with evicting Jessica and Kenny. Lieutenant Parkinson said the following:

> Bill, Lieutenant Parkinson with the Crime Free Housing Unit.
> Calling to find out where we're at with your property at 1632
> Maple -- why these people aren't being evicted yet. Let me know
> what I need to do, because if I have to present you to the mayor to
> revoke your business license there, I guess I'll have to do that.
> These people need to go. We've had the conversation. You didn't
> accept your letter. We'll be looking for you today. Thank you.

101.    A few hours after that, Lieutenant Parkinson and two other police officers tracked
Bill down at Jessica and Kenny's home and handed him a copy of the compulsory-eviction
demand.

102.    A true and correct copy of the compulsory-eviction demand Bill received is
attached to this complaint as Exhibit 3.

103.    The compulsory-eviction demand stated that Bill could "submit a grievance" to
the City's building and zoning administrator "within fifteen (15) days of receipt of this
notification."

104.     Bill mailed a copy of a written grievance addressed to the City's building and zoning administrator on August 1, 2019. He also hand delivered a copy of the written grievance to the office of the building and zoning administrator on August 1, 2019.

## INJURY TO PLAINTIFFS

105.     Jessica and Kenny do not want to leave their family's home.

106.     Bill does not want to evict Jessica, Kenny, and their children from their family's home.

107.     But for Granite City's compulsory-eviction demand, Bill would not even be considering evicting Jessica and Kenny's family from their home.

108.     Jessica and Kenny are not currently in violation of any term of their lease.

109.     Being evicted at the City's insistence would harm Jessica and Kenny: They do not own or rent any other property. If they are kicked out of their home, they are not sure where they would go. They do not have the resources to immediately rent another property. They would likely need to rely on charity from family to avoid rendering themselves and their children homeless.

110.     Being forced to evict Jessica and Kenny would also harm Bill. It would cost him money and time to pursue the eviction, and Bill would lose substantial money while the house sat vacant as he sought another tenant. Bill does not currently have another rental property that he could make available for Jessica and Kenny's family.

111.     Bill also has moral objections to evicting Jessica and Kenny's family. Jessica and Kenny are up to date on their rent and, from Bill's perspective, have been responsive and responsible tenants. Bill believes they deserve to stay.

112.    But Bill faces an impossible choice: If he complies with Granite City's compulsory-eviction demand, he puts an innocent family at risk of homelessness. If he defies Granite City's compulsory-eviction demand, he faces the revocation of his rental license—which is necessary for him to legally lease to Jessica and Kenny in the first place.

113.    One uniformed police officer has even threatened to arrest Bill for not evicting Jessica and Kenny.

114.    In the absence of intervention from this Court, Granite City's compulsory-eviction law and the City's associated practices and policies will cause Plaintiffs irreparable harm: Either Bill will be coerced to evict Jessica and Kenny against his wishes, or Bill will face losing his license (and will in turn lose the ability to legally rent 1632 Maple Street to Jessica and Kenny).

115.    Losing one's home is an irreparable harm.

116.    Granite City is inflicting this irreparable harm for no legitimate reason.

117.    Expelling Jessica and Kenny's family from their home will not eliminate any nuisance or noxious use of the property.

118.    Expelling Jessica and Kenny's family from their home will not even remove the individual who committed the crime resulting in eviction; he is already long gone.

119.    Expelling Jessica and Kenny's family from their home will push the family closer to homelessness without eliminating any condition that gave rise to Granite City's compulsory-eviction demand.

## CONSTITUTIONAL VIOLATIONS

### <u>Count I</u>
### Fourteenth Amendment to the U.S. Constitution
### (Due Process Clause)

120.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 119 of this complaint.

121.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

122.    The Due Process Clause secures against state infringement of those fundamental rights and liberties that are deeply rooted in our Nation's history and traditions and that are implicit in the concept of ordered liberty.

123.    Among those rights is the right of innocent people not to be punished by the government.

124.    Stripping innocent people of their home based on the crime of another infringes on their fundamental rights.

125.    Jessica and Kenny have a fundamental property right and a fundamental liberty interest in their installment contract with Bill Campbell.

126.    Jessica and Kenny have a fundamental property right and a fundamental liberty interest in their home at 1632 Maple Street, in Granite City, Illinois.

127.    Granite City's compulsory-eviction law violates Jessica's and Kenny's fundamental rights under the Due Process Clause.

128.    To the extent Jessica and Kenny's installment contract authorizes Bill to terminate the contract under certain conditions, Bill retains the discretion (as with any contract) to enforce or not enforce his right to terminate the contract.

129.    Bill does not want to terminate his contract with Jessica and Kenny based on Jason Lynch's crime.

130.    Bill would not even consider terminating his contract with Jessica and Kenny based on Jason Lynch's crime but for Granite City's demand that he do so.

131.    Effectively, the compulsory-eviction law requires that Jessica and Kenny's interest in their home at 1632 Maple Street be extinguished.

132.    Extinguishing Jessica and Kenny's interest in their home at 1632 Maple Street serves no purpose beyond punishing them (and their children) for a crime committed by Jason Lynch.

133.    In fact, the effect of extinguishing Jessica and Kenny's property right in their home at 1632 Maple Street in these circumstances would be to punish Jessica and Kenny far more harshly than Jason Lynch—even though Jason Lynch alone is alleged to have committed the crime in question.

134.    Jason Lynch no longer stays at 1632 Maple Street; evicting Jessica and Kenny is therefore not a means of removing Jason Lynch from a property where he does not live.

135.    Granite City does not contend Jessica and Kenny were participants or coconspirators in the crime committed by Jason Lynch.

136.    Jessica and Kenny were not participants or coconspirators or in any other way involved in the crime committed by Jason Lynch.

137.    Jessica and Kenny are not being punished for anything they did. They are instead being punished purely because Jason Lynch spent time in their home. Holding individuals strictly liable for crimes committed by people they associate with infringes their fundamental rights.

138.    The City's efforts to strip Jessica, Kenny, and their children of their home for Jason Lynch's crime shock the conscience.

139.    In turn, the City's efforts to coerce Bill into carrying out its violation of Jessica's and Kenny's rights violate Bill's due-process rights also.

140.    Bill has a fundamental right not to be dragooned into the City's campaign to make his innocent tenants homeless.

141.    The City's efforts to coerce Bill into expelling Jessica and Kenny from their home under these circumstances shock the conscience.

142.    Just as Granite City cannot violate Jessica's and Kenny's fundamental rights directly, the City cannot coerce Bill to violate Jessica's and Kenny's fundamental rights on its behalf.

143.    Granite City's compulsory-eviction law, on its face and as applied to Plaintiffs, violates the Due Process Clause of the Fourteenth Amendment.

144.    Unless the City is enjoined from enforcing the compulsory-eviction law, Plaintiffs will continue to suffer irreparable harm.

145.    Plaintiffs have no other remedy by which to prevent or minimize this continuing irreparable harm to their constitutional rights.

146.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

## Count II
## Fourteenth Amendment to the U.S. Constitution
### (Equal Protection Clause)

147.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 146 of this complaint.

148.    The Equal Protection Clause of the Fourteenth Amendment requires government officials to treat similarly situated individuals similarly.

149.    Granite City's compulsory-eviction law violates the Equal Protection Clause of the Fourteenth Amendment in at least three ways.

150.    *First*, the compulsory-eviction law treats Jessica and Kenny differently from people who are identically situated in all respects but one: people who have a traditional mortgage rather than an installment contract.

151.    The City's compulsory-eviction law distinguishes between (1) people who own their homes in fee simple or who have traditional mortgages, and (2) people who rent their homes or who are buying their homes under an installment contract.

152.    The only reason Jessica and Kenny are required to be evicted under the compulsory-eviction law is that their property interest in their home at 1632 Maple Street takes the form of a leasehold. If they held any other property interest in their home—fee simple, fee simple subject to a mortgage lien, a life estate, etc.—they would not be subject to the compulsory-eviction law.

153.    If, at the time he committed his offense, Jason Lynch had been staying with a family that owned their home in fee simple, the City could not have enforced its compulsory-eviction law against that family.

154.    If, at the time he committed his offense, Jason Lynch had been staying with a family that owned their home in fee simple subject to a traditional mortgage, the City could not have enforced its compulsory-eviction law against that family.

155.    In all material respects, Jessica and Kenny are similarly situated to other Granite City residents who own their homes in fee simple.

156.    In all material respects, Jessica and Kenny are similarly situated to other Granite City residents who have a traditional mortgage.

157.    In distinguishing between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract, the City is burdening the latter residents' fundamental rights.

158.    The City cannot justify under any level of scrutiny its distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract.

159.    On information and belief, the City will be unable to produce any evidence sufficient to justify its distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract.

160.    The City's distinction between residents who own their homes in fee simple (or subject to a traditional mortgage) and residents who rent their homes or are buying them under an installment contract fails every level of constitutional scrutiny. That is because the distinction is not rationally related to a legitimate governmental interest.

161.    Homebuyers who purchase their home using an installment contract, like Jessica and Kenny, usually do so because they are too poor to qualify for a traditional mortgage.

162.    There is no legitimate reason for Granite City's compulsory-eviction law to treat Jessica and Kenny worse than the City's more affluent residents.

163.    *Second*, Granite City's compulsory-eviction law treats Jessica and Kenny differently from other people who have the same amount of alleged responsibility—i.e., none— for the crime underlying the City's compulsory-eviction demand.

164.     Under the compulsory-eviction law, Bill Campbell is required to evict Jessica and Kenny from 1632 Maple Street because Jason Lynch committed a crime somewhere else.

165.     Neither Jessica nor Kenny had any involvement in Jason Lynch's crime.

166.     Neither Jessica nor Kenny had any responsibility for Jason Lynch's crime.

167.     In fact, Jessica took several important steps to help the police apprehend Jason Lynch, including alerting the authorities to Jason Lynch's presence in her home and voluntarily admitting police officers into her home so they could arrest him.

168.     With respect to the crime that is the basis for Granite City's compulsory-eviction demand, Jessica and Kenny are similarly situated to everyone else in the world (except for Jason Lynch) in that they have no responsibility for Jason Lynch's crime.

169.     Yet Granite City's compulsory-eviction law singles them out for unique—and uniquely harsh—treatment.

170.     If Bill were to evict Jessica and Kenny, he would be free to rent 1632 Maple Street to literally anyone else in the world—including Jason Lynch, whose alleged crime is the sole basis for the City's compulsory-eviction demand.

171.     Jessica and Kenny are being treated worse than everyone else in the world, including Jason Lynch: under the City's compulsory-eviction law, they alone are prohibited from living in their home at 1632 Maple Street.

172.     There is no good reason that Jessica and Kenny—alone in the world—are forbidden from maintaining a home at 1632 Maple Street.

173.     In distinguishing between Jessica and Kenny and everyone else in the world, Granite City's compulsory-eviction law burdens Jessica and Kenny's fundamental rights.

174.    The City cannot justify under any level of scrutiny its distinction between Jessica and Kenny and everyone else in the world.

175.    On information and belief, the City will be unable to produce any evidence sufficient to justify its distinction between Jessica and Kenny and everyone else in the world.

176.    The City's distinction between Jessica and Kenny and everyone else in the world fails every level of constitutional scrutiny. That is because the distinction is not rationally related to a legitimate governmental interest.

177.    There is no legitimate reason for Granite City's compulsory-eviction law to treat Jessica and Kenny worse than everyone else in the world.

178.    *Third*, Granite City's compulsory-eviction law treats Bill Campbell differently from every other landlord in Granite City.

179.    The compulsory-eviction law requires Bill to evict Jessica and Kenny from their home at 1632 Maple Street.

180.    Immediately upon their eviction, any other landlord at any other property in Granite City would be free to rent any other home to Jessica and Kenny.

181.    Indeed, Jessica and Kenny would be eligible to rent a different home from Bill himself. If, for example, Bill also owned 163*4* Maple Street, he could comply with the terms of the compulsory-eviction law simply by moving Jessica and Kenny next door—even if Jason Lynch were a member of their household.

182.    Unlike every other landlord in Granite City, therefore, Bill's right to lease property to Jessica and Kenny is restricted.

183.    Under the compulsory-eviction law, every other landlord in Granite City can rent any of his or her properties to Jessica and Kenny.

184.    Under the compulsory-eviction law, Bill can rent any of his properties to Jessica and Kenny except 1632 Maple Street.

185.    Requiring Jessica and Kenny to move but not to otherwise change anything about their household does not serve any legitimate end of government. There is no legitimate reason for Granite City to prevent Bill from leasing 1632 Maple Street to Jessica and Kenny when any other landlord remains free to lease them any other property within city limits.

186.    In distinguishing between Bill and every other landlord in Granite City, the City's compulsory-eviction law burdens his rights and, of course, burdens Jessica and Kenny's fundamental right to continue living in the home Bill is leasing them.

187.    The City cannot justify under any level of scrutiny its distinction between Bill and every other landlord in Granite City.

188.    On information and belief, the City will be unable to produce any evidence sufficient to justify its distinction between Bill and every other landlord in Granite City.

189.    The City's distinction between Bill and every other landlord in Granite City fails every level of constitutional scrutiny. That is because the distinction is not rationally related to a legitimate governmental interest.

190.    There is no legitimate reason for Granite City's compulsory-eviction law to treat Bill differently from every other landlord in Granite City.

191.    For each of the grounds described above, Granite City's compulsory-eviction law, on its face and as applied to Plaintiffs, violates the Equal Protection Clause of the Fourteenth Amendment.

192.    Unless Granite City is enjoined from enforcing the compulsory-eviction law against Plaintiffs, Plaintiffs will continue to suffer irreparable harm.

193.    Plaintiffs have no other remedy by which to prevent or minimize this continuing irreparable harm to their constitutional rights.

194.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

**Count III**
**Fifth and Fourteenth Amendments to the U.S. Constitution**
**(Takings Clause)**

195.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 194 of this complaint.

196.    A leasehold is a property interest protected under Illinois law, including a leasehold that takes the form of an installment contract as described above.

197.    Jessica and Kenny's installment contract at 1632 Maple Street in Granite City is a property interest protected under Illinois law.

198.    Jessica and Kenny's installment contract as described above has also given them a greater equity stake in 1632 Maple Street than a typical lessee would have.

199.    If Granite City is successful in its efforts to coerce Bill Campbell to evict Jessica and Kenny from 1632 Maple Street against his will, Jessica and Kenny's entire property interest in 1632 Maple Street will be destroyed.

200.    Because Bill Campbell would not terminate Jessica and Kenny's lease at 1632 Maple Street but for Granite City's command that he do so, Granite City's command will be the sole cause of the destruction of Jessica and Kenny's property interest in 1632 Maple Street.

201.    Granite City, acting under color of law, seeks to cause Jessica and Kenny to be deprived of their property interest in 1632 Maple Street without just compensation in violation of the Takings Clause of the Constitution.

202.     As applied to Jessica and Kenny, Granite City's compulsory-eviction law is being deployed to deprive them of a reasonable market return on their interest in 1632 Maple Street and upset their investment-backed expectations.

203.     Unless Granite City is enjoined from enforcing the compulsory-eviction law, Jessica and Kenny will continue to suffer irreparable harm.

204.     Jessica and Kenny have no other remedy by which to prevent or minimize this continuing irreparable harm to their constitutional rights.

205.     Absent declaratory and injunctive relief, Jessica and Kenny will suffer irreparable harm caused by the deprivation of their constitutional rights.

<u>**Count IV**</u>
**First and Fourteenth Amendments to the U.S. Constitution**
**(Freedom of Association)**

206.     Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 205 of this complaint.

207.     The U.S. Constitution (including the First and Fourteenth Amendments) protects the right of association.

208.     The only reason that Granite City is trying to force Jessica and Kenny out of their home is that they allowed Jason Lynch to stay there.

209.     Allowing a teenager to stay in your home to shelter him from the cold is a form of association.

210.     Punishing Jessica and Kenny for crimes committed by Jason Lynch is punishing them for their decision to associate with Jason Lynch.

211.    Granite City's compulsory-eviction law contains none of the procedural protections or substantive requirements found in any of the other legal tools, like the law of conspiracy, by which one person may be held responsible for the crimes of another.

212.    Instead, the compulsory-eviction law imposes guilt by association for the crimes of anyone who lives with a lessee, whether they are a brother, a daughter, a lover, or (as here) a teenager granted temporary shelter.

213.    Holding individuals strictly liable for crimes committed by people they associate with burdens the right to association.

214.    Upon information and belief, Granite City has no good reason—and possesses no evidence suggesting it has a good reason—for holding lessees strictly liable for the crimes of their household members and guests.

215.    Granite City's compulsory-eviction law, on its face and as applied to Jessica and Kenny, unconstitutionally violates their right to association.

216.    Unless the City is enjoined from enforcing the compulsory-eviction law, Jessica and Kenny will continue to suffer irreparable harm.

217.    Jessica and Kenny have no other remedy by which to prevent or minimize this continuing irreparable harm to their constitutional rights.

218.    Absent declaratory and injunctive relief, Jessica and Kenny will suffer irreparable harm caused by the deprivation of their constitutional rights.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court:

A.    Declare that Granite City's compulsory-eviction law—both on its face and as applied to Plaintiffs—violates the Fourteenth Amendment's Due Process Clause,

the Fourteenth Amendment's Equal Protection Clause, the Fifth Amendment's

Takings Clause, and the constitutional right to association;

B.       Preliminarily and permanently enjoin Granite City from enforcing its compulsory-

eviction law and associated policies and practices against Plaintiffs;

C.       Preliminarily and permanently enjoin Granite City from enforcing its compulsory-

eviction law and associated policies and practices against Plaintiffs based on the

crime alleged in the compulsory-eviction demands attached to this Complaint as

Exhibits 2 and 3;

D.       Award Plaintiffs $1.00 in nominal damages for each and every violation of a

provision of the U.S. Constitution;

E.       Award attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C.

§ 1988 and all other applicable federal laws;

F.       Award such further legal and equitable relief as the Court may deem just and

proper.

Dated: August 1, 2019                           Respectfully submitted,

s/Bart C. Sullivan
Bart C. Sullivan, #6198093                      Samuel B. Gedge*
FOXGALVIN, LLC                                  Robert McNamara*
One South Memorial Drive, 12th Floor            INSTITUTE FOR JUSTICE
St. Louis, MO 63102                             901 North Glebe Road, Suite 900
Phone: 314.588.7000                             Arlington, VA 22203
Facsimile: 314.588.1965                         Telephone: 703.682.9320
E-mail: bsullivan@foxgalvin.com                 Facsimile: 703.682.9321
                                                E-mail: sgedge@ij.org; rmcnamara@ij.org

                                                *Motions for general admission pending