## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS

JESSICA BARRON, KENNETH WYLIE,
and WILLIAM CAMPBELL,

*Plaintiffs,*

v.

THE CITY OF GRANITE CITY, ILLINOIS,

*Defendant.*

Case No. 3:19-cv-00834-SMY-MAB

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

In accordance with Federal Rule of Civil Procedure 65, Plaintiffs Jessica Barron, Kenneth Wylie, and William Campbell move for a preliminary injunction enjoining the City of Granite City from enforcing its compulsory-eviction law (Granite City Mun. Code §§ 5.142.010 *et seq.*) against Plaintiffs during the pendency of this case, from taking any steps to remove Plaintiffs Jessica Barron and Kenny Wylie from their home during the pendency of this case, and from taking any steps against Plaintiff Campbell for declining to evict Plaintiffs Barron and Wylie during the pendency of this case.

## INTRODUCTION

Without this Court's intervention, Plaintiffs Jessica Barron and Kenny Wylie—and their three children—face the imminent prospect of losing their home. Jessica and Kenny live with their three children at 1632 Maple Street, a modest house in Granite City, Illinois. Kenny works as a forklift operator; Jessica is struggling to find work as a housekeeper. Over the past two months, the City has taken escalating steps to try to make them homeless. Police officers have

pounded on their door. One officer told Jessica he was "personally" evicting her. The same officer threatened to arrest Jessica and Kenny's landlord (co-plaintiff Bill Campbell) for not yet evicting them. Most recently, on July 17, three officers personally served Bill with a formal demand "THAT AN EVICTION NOTICE BE SERVED AND THE EVICTION PROCESS INITIATED." V. Compl. Ex. 3, at 1-2. In the words of one police officer, "[t]hese people need to go." V. Compl. ¶ 100.

The basis for Granite City's campaign is not that Jessica and Kenny have done anything wrong; it is that a friend of their sixteen-year-old son broke into a restaurant elsewhere in town. Because the friend often spent time at Jessica and Kenny's home, the City has invoked its compulsory-eviction law and demanded that Bill Campbell evict Jessica, Kenny, and their children. Under the law, the City coerces private landlords to evict entire families if any member of the household (or even a guest) commits a crime anywhere within city limits (or, sometimes, anywhere at all). It is no defense that some or all of the tenants had nothing to do with the crime. Here, in fact, police caught the restaurant burglar only after Jessica discovered him in her home and alerted the authorities. *See id.* ¶ 72. No matter; the City wants her gone, and Kenny gone, and their children gone, because of someone else's misdeed.

This exercise in collective punishment is profoundly unconstitutional, and all the relevant factors support a preliminary injunction:

*First*, Plaintiffs are likely to prevail under both the Due Process Clause and the Equal Protection Clause. "In our jurisprudence guilt is personal." *Scales v. United States*, 367 U.S. 203, 224 (1961). Yet the City is poised to strip Jessica and Kenny of their home because someone else, somewhere else, did something illegal. Because the City's compulsory-eviction law begins and ends with guilt by association, Plaintiffs' due-process claim is highly likely to prevail. At a

minimum, Plaintiffs' odds are far "better than negligible," which is the merits standard at the preliminary-injunction stage. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016).

Plaintiffs also are likely to prevail on equal-protection grounds. Granite City's compulsory-eviction law threatens innocent people with homelessness—but only certain ones. For people with the resources to get a traditional mortgage, the City's compulsory-eviction law does not apply. But Jessica and Kenny don't have a traditional mortgage; they are buying their home under an installment contract. For the City, that makes all the difference. Because Jessica and Kenny are too poor to qualify for a traditional mortgage, the compulsory-eviction law applies to them, and the City claims the power to make them homeless. In short, the City is not just infringing Jessica and Kenny's fundamental right to their home; its actions are arbitrary in a way the Equal Protection Clause does not countenance.

*Second,* the equitable factors cement Plaintiffs' need for preliminary relief. Without this Court's intervention, Jessica, Kenny, and their children face imminent homelessness. Bill Campbell, of course, has no intention of buckling to the City's eviction demands. But his refusal will expose him to governmental sanctions, including revocation of his business license. Whatever Bill does, the City seeks to punish him and to strip Jessica and Kenny of their home. That is a textbook irreparable injury, and the balance of hardships tips decisively in Plaintiffs' favor. A preliminary injunction is warranted.

**BACKGROUND**

### A.     Granite City's compulsory-eviction law

*1.*     In 1988, Congress developed a "one-strike" policy for public housing. Under the policy (which remains in effect), public-housing leases must provide that tenants can be evicted if they, or members of their household, or guests, commit certain crimes. 42 U.S.C. § 1437d(*l*)(6); *see generally* Kathryn V. Ramsey, *One-Strike 2.0: How Local Governments Are*

*Distorting a Flawed Federal Eviction Law*, 65 UCLA L. Rev. 1146, 1169-71 (2018). As with other lease terms, the public-housing agency—the landlord—has discretion to "consider all circumstances relevant to a particular case" in choosing whether to invoke a lease's one-strike clause. 24 C.F.R. § 966.4(*l*)(5)(vii)(B).

The Supreme Court upheld the federal one-strike policy in 2002, in *HUD v. Rucker*, 535 U.S. 125. As a statutory matter, the Court ruled that Congress gave public-housing authorities discretion to evict tenants based on their guests' crimes, "regardless of whether the tenant knew, or had reason to know, of that activity." *Id.* at 128. And constitutionally, the Court suggested that evicting those "so-called 'innocent' tenants" raised no due-process concerns. *Id.* at 129. In this sphere, the Court reasoned, a public-housing authority is merely "acting as a landlord of property that it owns." *Id.* at 135. Like any landlord, the agency can choose to invoke—or not invoke—a lease term to which the tenant agreed. *See id.* at 133-34 ("The statute does not *require* the eviction of any tenant who violated the lease provision.").

At the same time, the Court in *Rucker* observed that the due-process analysis is "entirely different" when the government acts "as sovereign." *Id.* at 135. If the government were "attempting to criminally punish or civilly regulate [people] as members of the general populace," *id.*, the Court indicated that the Due Process Clause would apply with full force.

    *2.*       Granite City took that warning as a blessing. Declaring that *Rucker* had "approved" state-mandated evictions for the public at large, Gedge Decl. Ex. 1, at 133, the City enacted a compulsory-eviction law to govern every private landlord and tenant within city

limits.[1] The law also applies to certain people who are buying their homes under a contract for deed (also known as an installment contract). Granite City Mun. Code § 5.142.010.

In 2013, Granite City's city attorney identified the compulsory-eviction law as the "most controversial issue [he had] worked on." Julie Murphy, *Beyond zoning: St. Louis area attorneys see it all*, St. Louis Bus. J., Sept. 27, 2013. Unlike the one-strike policy upheld in *Rucker*, Granite City mandates that private landlords evict entire families from their homes if any member of the "household" commits a crime anywhere within city limits. Granite City Mun. Code § 5.142.050(A)(3)(c); Gedge Decl. Ex. 2, at ¶¶ 1, 3, 8-9 (Lease Addendum for Crime Free Housing); Compl ¶¶ 14-48. Some crimes trigger compulsory eviction "no matter where said felony occurs." Gedge Decl. Ex. 3, at 1. In fact, more than one hundred of the City's compulsory-eviction demands cite crimes that occurred outside the home—shoplifting, for example, or driving with a revoked license. Compl. ¶ 48. And no matter where a crime takes place, it is no defense that some or all of the tenants had nothing to do with it.

Nor do the landlords have any discretion to forgo eviction. If the City sends a compulsory-eviction demand, the landlord must "take prompt, diligent and lawful steps to remove the lessees from possession of the rental unit." Granite City Mun. Code § 5.142.050(A)(3); *see also* V. Compl. Ex. 3, at 1-2. The landlord cannot forgo eviction because the tenants were not involved in the alleged offense. Or because the tenants were unaware of the offense. Or because the offense had no connection to the tenant's home. Or because eviction would render the tenants homeless. If a tenant, or a member of their household, or even a guest

---

[1] The ordinances, court orders, and city manual accompanying this motion are self-authenticating under Federal Rules of Evidence 902(1) or 902(5) and are subject to judicial notice under Rule 201, *see Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002); *In the Matter of Lisse*, 905 F.3d 495, 496 (7th Cir. 2018) (Easterbrook, J., in chambers), and Plaintiffs ask that the Court take judicial notice of them.

breaks the law anywhere in Granite City, the landlord must evict the entire family or have his license suspended or revoked. Granite City Mun. Code § 5.142.050(B)-(C).

From 2014 to the present, Granite City has issued more than 300 compulsory-eviction demands. Compl. ¶ 48.

### B.    Jessica Barron, Kenny Wylie, and their children

*1.*    Jessica Barron and Kenny Wylie were born and raised in Granite City. V. Compl. ¶ 49. They have been in a committed relationship for the last 18 years and have three teenage children. *Id.* For the past two years, the family has lived in a small house at 1632 Maple Street; they are buying the house under an installment contract with Bill Campbell. *Id.* ¶¶ 51-53. Each month, they pay Bill an installment toward the final purchase price. *Id.* ¶ 53. This arrangement is common for people who do not qualify for a traditional mortgage.

Jessica and Kenny have an open-door policy when it comes to their children's friends. *Id.* ¶ 57. Many teenagers in Granite City come from troubled backgrounds, and Jessica and Kenny view their home as a safe zone for kids who are having difficulties with their families or who are otherwise struggling. *Id.* For a time, Jessica and Kenny fostered Jessica's nephew. *Id.* ¶ 58. (Kenny is certified to be a foster parent with family services. *Id.*) And while Jessica and Kenny do not foster children currently, it is not uncommon for their children's friends to come by for a meal, or to have Jessica do their laundry, or to spend the night. *Id.* ¶ 59.

Last autumn, their eldest son (now sixteen) befriended an eighteen-year-old boy named Jason Lynch. *Id.* ¶ 60. Jason Lynch did not have a permanent home in the area—he had recently come from Rolla, Missouri—and he at first told Jessica and Kenny that he was homeless and (falsely) that his mother was dead. *Id.* ¶¶ 61-62. Like others of their son's friends, he would sporadically spend time at their home. *Id.* ¶ 63. Sometimes he would sleep over. *Id.* When it got

cold out this past winter, he started spending more nights at the house. *Id.* ¶ 64. His movements were irregular, but he would often sleep there a few nights a week. *Id.*

On the night of May 21, 2019, Jason Lynch broke into a restaurant in Granite City. *Id.* ¶ 65. Neither Jessica nor Kenny had anything to do with the crime. *Id.* ¶ 66. The next morning, Jessica encountered Jason Lynch in her home and told him to get out; she knew nothing about the burglary, but she noticed that he was holding beers. *Id.* ¶ 67. Later that day, as Jessica was returning from her sister's house, a Granite City police officer approached her outside her home. *Id.* ¶ 68. The officer informed her that Jason Lynch was suspected of having burglarized the restaurant the night before, and he asked Jessica whether Jason Lynch was inside her home. Jessica (accurately, she thought) said he was not. *Id.* ¶¶ 69-71. But upon entering her home, she found that Jason Lynch had in fact returned. *Id.* ¶ 72. She quietly told her younger son to run down the street and find the police officer. *Id.* Her son did so. *Id.* With Jessica's consent, several police officers then entered her home, and she led them into her basement and directed them to a crawlspace where Jason Lynch was hiding. *Id.* As they removed him from the house, one of the officers thanked Jessica and told her that she had done the right thing by contacting them. *Id.*

2.     That same day, the State of Illinois charged Jason Lynch with one count of burglary. Compl. ¶ 73. A week after that, he pleaded guilty. Gedge Decl. Ex. 4, at 1. The circuit court sentenced him to probation and released him. *Id.* at 1-3.

Following his arrest, Jason Lynch showed up at Jessica and Kenny's home a couple of times. V. Compl. ¶ 76. But Jessica promptly told him to stop coming by, and he stopped. *Id.*

3.     In the months since Jason Lynch's arrest, Granite City has deployed its compulsory-eviction law to try to force Jessica, Kenny, and their children from their home.

Around June 18, Lieutenant Mike Parkinson—Granite City's "Crime Free Multi-Housing Officer"—called Bill Campbell (who owns the home), told him about the incident with Jason Lynch, and insisted that Jessica and Kenny "just have to go." *Id.* ¶¶ 77-78. Understandably, Bill does not want to evict them for Jason Lynch's crime. *Id.* ¶ 80. He thinks the compulsory-eviction law is unjust. *Id.* ¶ 81. He thinks that Jessica and Kenny had nothing to do with Jason Lynch's misconduct. *Id.* ¶ 82. And he knows they're good tenants. *Id.* ¶ 83. So rather than evict them outright, he sent them a 30-day notice, telling them to keep the property in good shape and make sure Jason Lynch stopped coming around. *Id.* ¶ 85.

That was not good enough for the City. A week later, on June 24, Jessica showed up for a hearing at city hall about a citation for overlong grass and an allegedly misplaced sump pump. *Id.* ¶ 86. While she was talking with an official about those issues, a uniformed police officer confronted her. *Id.* ¶ 87. He asked her whether her family had been evicted yet. *Id.* ¶ 89. Jessica had no idea what he was talking about, and she said as much. *Id.* ¶ 90. In response, the officer told her that she was subject to eviction because Jason Lynch had committed burglary. *Id.* ¶ 91. Jessica explained that she had alerted the police to Jason Lynch's whereabouts and let officers into her home to arrest him. *Id.* Even so, the officer declared that he was "personally" evicting her and that he intended to arrest Bill Campbell for not filing an eviction action. *Id.* ¶ 92.

A day later, the same officer knocked on Jessica's front door and served her with a compulsory-eviction demand. *Id.* ¶ 93. The demand stated that "Jason S. Lynch . . . resides at 1632 Maple Ave." and that "Jason S. Lynch was formally charged with Burglary." *Id.* Ex. 2, at 1 (capitalizations altered). "Since this felony incident occurred in the City of Granite City," the demand stated, "it is a direct violation of the Granite City Crime Free Multi Housing Ordinance and a violation of the Crime Free Multi Housing Lease Addendum." *Id.* at 1-2. On that basis,

"[t]his violation requires that an eviction notice be served and the eviction process initiated." *Id.* at 2.

Bill Campbell was served with the compulsory-eviction demand nearly a month later. V. Compl. ¶¶ 99-102. On July 17, Lieutenant Parkinson left Bill a voicemail demanding that he evict Jessica and Kenny, threatening to revoke his business license, and insisting that "[t]hese people need to go." *Id.* ¶ 100. That same day, three police officers tracked Bill down at Jessica and Kenny's home and handed him the demand. *Id.* ¶ 101; *see also id.* Ex. 3.

## ARGUMENT

A preliminary injunction preserves the status quo and the rights of the parties until final judgment. *Ed's Pallet Servs., Inc. v. Applied Underwriters, Inc.*, No. 15-cv-1163, 2015 WL 12851786, at *1 (S.D. Ill. Dec. 15, 2015). It should issue if the plaintiff establishes: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)). In evaluating these elements, the courts of this circuit "employ[] a 'sliding scale' approach." *Id.* at 338 (citation omitted). "[T]he plaintiff's chances of prevailing need only be better than negligible," and a stronger showing on one element may offset a weaker showing on another. *Id.* Each element heavily favors a preliminary injunction here.

### A.    Plaintiffs are likely to succeed on the merits.

Granite City seeks to punish Jessica Barron and Kenny Wylie for someone else's crime. That breaks with the basic structure of our justice system and thus violates the Due Process Clause. The City's compulsory-eviction law also targets only certain people for compulsory evictions: those who are too poor to qualify for a traditional mortgage. If Jessica and Kenny were to have a traditional mortgage—rather than an installment contract—the compulsory-eviction

law would not apply at all. In this way, the City targets its most vulnerable citizens in a manner that cannot be squared with the Equal Protection Clause.[2]

### 1. *The City's compulsory-eviction law violates the Due Process Clause.*

**a.** "No property is more sacred than one's home," *Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 704-05 (1897), and Jessica Barron and Kenny Wylie have core property and liberty interests in theirs, *cf. Dyson v. Calumet City*, 306 F. Supp. 3d 1028, 1042 (N.D. Ill. 2018) ("[T]hat [the plaintiff] holds a leasehold property interest rather tha[n] a fee simple one does not matter."). Granite City seeks to extinguish those interests and make Jessica and Kenny—and their three children—homeless. The City does not base this action on anything Jessica did, or Kenny did, or their children did. Nor does the City base its action on any misconduct on their property. It is enough that a friend of Jessica and Kenny's son, who sometimes slept at their home, broke into a restaurant. *See* V. Compl. ¶¶ 60-76; *id.* Ex. 3, at 1-2.

Ejecting Jessica and Kenny's family from their home on this basis violates the Fourteenth Amendment's Due Process Clause at a bedrock level. The Supreme Court has "regularly observed" that "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). And in trying to strip an innocent family of their home, Granite City is working a double harm. The City is infringing "the sanctity of the home"—an "overriding respect" for which "has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601 (1980). Worse, the City is imposing this sanction because of someone else's crime. That, too, breaks with "[o]ur Nation's history, legal traditions,

---

[2] Plaintiffs' complaint also asserts claims under the Fifth Amendment's Takings Clause and the constitutional right of association. Compl. ¶¶ 195-218.

and practices." *Glucksberg*, 521 U.S. at 721. "In our jurisprudence guilt is personal." *Scales v. United States*, 367 U.S. 203, 224 (1961). Yet the entire premise of the City's actions is guilt by association. Someone loosely associated with Jessica and Kenny broke the law; for that, the City seeks to make Jessica and Kenny and their children homeless.

Imputing guilt in this way is "contrary to fundamental principles of our justice system." *See United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998). In fact, this sort of "guilt by association" has been described as "one of the most odious institutions of history." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951) (Douglas, J., concurring). It is "a philosophy alien to the traditions of a free society . . . ." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982) (citation omitted). One California judge even branded a similar compulsory-eviction law "carcinogenic," citing "the Damoclean substantive due process issue which hangs over this statutory scheme." *Cook v. City of Buena Park*, 126 Cal. App. 4th 1, 10 (2005) (Bedsworth, Acting P.J., concurring); *see also id.* ("I am concerned . . . about its sweeping requirement that *all* occupants of the premises must be evicted for the sins of one . . . ."). And Granite City's law is far worse than the ordinance at issue in the California case. For all its "fundamental constitutional infirmities," *id.*, the California ordinance required eviction only for crimes "in or near the rental property." *Id.* at 3 (majority opinion). Granite City has gone several steps further: It seeks to kick Jessica and Kenny out of their home for a crime having nothing to do with them and having nothing to do with their home.

This experiment with collective punishment "has no place" in our system of ordered liberty. *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966). Nor does it matter that the City is exercising power civilly rather than prosecuting Jessica and Kenny criminally. "Whether the sanction is criminal or civil in nature is not determinative." David Cole, *Hanging with the Wrong Crowd: Of*

*Gangs, Terrorists, and the Right of Association*, 1999 Sup. Ct. Rev. 203, 219. That is why the

Supreme Court "has consistently disapproved governmental action imposing criminal sanctions

or denying rights and privileges solely because of a citizen's association with an unpopular

organization." *Healy v. James*, 408 U.S. 169, 185-86 (1972). During the McCarthy era, for

instance, the Supreme Court invalidated many such regimes. Cole, *supra*, at 218. And in the

years since, it "has continued to adhere to the prohibition on guilt by association, and to extend it

to noncriminal settings." *Id.* at 219 n.46; *see also, e.g.*, *Claiborne Hardware Co.*, 458 U.S. at 925

n.69 ("[C]ivil liability may not be imposed merely because an individual belonged to a group,

some members of which committed acts of violence."). These principles apply with full force

here. The Due Process Clause would not allow Granite City to fine Jessica and Kenny even one

dollar for Jason Lynch's crime. The City could not constitutionally incarcerate them for even one

hour. No more can it oust them and their children from their home.[3]

  **b.**  It makes no difference that Granite City forces private landlords to bring evictions

rather than doing the job itself. The City cannot do indirectly what it "could not command

directly," *Speiser v. Randall*, 357 U.S. 513, 526 (1958), and state actors cannot shield themselves

from the Constitution by coercing one private actor to harm another, *see, e.g.*, *Peterson v. City of

Greenville*, 373 U.S. 244, 248 (1963). Here, the City has required Bill, Jessica, and Kenny to be

bound by the compulsory-eviction law. Granite City Mun. Code § 5.142.060. Granite City police

officers have repeatedly demanded that Bill evict Jessica and Kenny. V. Compl. ¶¶ 77-102. The

City is threatening to strip him of his business license. *Id.* ¶ 100. One police officer has promised

---

[3] The Supreme Court's condemnations of "guilt by association" frequently arise in cases
involving political organizations and for that reason the Court often couches its reasoning in First
Amendment terms. The Court has been clear, however, that guilt by association conflicts equally
with the Fifth and Fourteenth Amendments' Due Process Clauses. *See, e.g.*, *Scales*, 367 U.S. at
224-30; Cole, *supra*, at 215-18; *see also* Compl. ¶¶ 206-18 (freedom-of-association claim).

to arrest him. *Id.* ¶ 92. The City's compulsory-eviction law—and its persistent attempts to enforce that law—violates the Due Process Clause. And if anything, the City's preference for eviction-by-proxy only compounds the constitutional harm, for the City is violating not just Jessica's and Kenny's rights, but Bill's too. *See generally* Ramsey, *supra*, at 1179 ("One of the most striking aspects of [crime-free housing ordinances] is the way in which they insert the local police department directly into the private landlord-tenant relationship, to the detriment of both landlords and tenants.").

c.      As against all this, Granite City appears to labor under the misimpression that the Supreme Court "approved" its compulsory-eviction scheme in *HUD v. Rucker*, 535 U.S. 125 (2002). *See* page 4, above. Yet *Rucker* only spotlights how far afield the City has strayed. When the government "is . . . acting as a landlord of property that it owns," the Supreme Court reasoned, it has much the same powers any private landlord has. *Rucker*, 535 U.S. at 135. That includes the power to "invok[e] a clause in a lease" and (subject to the lease's terms) to evict even innocent tenants. *Id.* "[S]uch 'no-fault' eviction," the Court noted, "is a common 'incident of tenant responsibility under normal landlord-tenant law and practice.'" *Id.* at 134. (In Illinois, for example, landlords have the "option" to void a lease if their property is used for certain crimes. 735 Ill. Comp. Stat. 5/9-120(a).) But the Supreme Court made clear that the due-process analysis is "entirely different" when the government acts "as sovereign." *Rucker*, 535 U.S. at 135. When the government "attempt[s] to criminally punish or civilly regulate [people] as members of the general populace," *id.*, it does not enjoy a blank check to punish the blameless.

Granite City claims just such a blank check here. Unlike the public-housing authority in *Rucker*, Granite City is not Jessica and Kenny's landlord. Bill Campbell is, and Bill doesn't want to evict them for Jason Lynch's crime. V. Compl. ¶¶ 80-84, 106-07. Again unlike the housing

authority in *Rucker*, the City is not invoking a contract to which it is party; it is intruding on the contracts of others, armed with a battery of governmental sanctions. These actions are paradigmatically "sovereign." *Rucker*, 535 U.S. at 135. In *Rucker*'s words, the City is "attempting to . . . civilly regulate" Jessica, Kenny, and Bill "as members of the general populace." *Id.* Indeed, its compulsory-eviction law says so explicitly. In it, the City cites its intent to "reduce the risk of neighborhood property devaluation," to "reduce the risk of crime," and to "promote the public safety and welfare." Gedge Decl. Ex. 3, at 1.

To achieve those goals, governments have all manner of tools at their disposal. If people like Jason Lynch commit crimes, Granite City can arrest them. If they are a threat to the community, the State can argue for pretrial detention. At sentencing, prosecutors can ask for incarceration, rather than probation. If a property is a nuisance, the nuisance can be abated. What Granite City may not do, however, is punish one person for the crimes of another. Because the City's compulsory-eviction law invites precisely that "odious" injustice here, *see McGrath*, 341 U.S. at 178 (Douglas, J., concurring), Plaintiffs are highly likely to succeed on their due-process claim.

### 2. The City's compulsory-eviction law violates the Equal Protection Clause.

Plaintiffs also are likely to prevail on equal-protection grounds. The Fourteenth Amendment's Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, when a legislative distinction impinges on a fundamental right, that distinction is subject to strict scrutiny. *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). And regardless of the right infringed, no law is valid if irrational. *Plyler v. Doe*, 457 U.S. 202, 223 (1982). Here, for the reasons discussed above (at 10), Americans enjoy a fundamental right not to have the

government eject them from their homes. "[I]t is beyond dispute," after all, "that the home is entitled to special protection as the center of the private lives of our people." *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (citation omitted). For a city to make innocent citizens homeless is a grave act. Yet at every turn, Granite City's compulsory-eviction law is so arbitrary that Plaintiffs' equal-protection claim stands a high likelihood of success.

**a.**　　Granite City's compulsory-eviction law treats similarly situated people differently: it distinguishes between people paying off a traditional mortgage and those paying off an installment contract—known colloquially as "a 'poor man's mortgage.'" *See* Heather K. Way, *Informal Homeownership in the United States and the Law*, 29 St. Louis U. Pub. L. Rev. 113, 128 (2009). If you qualify for a traditional mortgage, Granite City's compulsory-eviction law will never apply to you. *See* Granite City Mun. Code § 5.142.010. For example, someone in an owner-occupied home could commit murder on the premises, and the compulsory-eviction law would have nothing to say. If you have the credit for a traditional mortgage, your son (or his friend) could break into the same restaurant Jason Lynch did—under identical circumstances— and your home would be safe. But things are different for people buying their homes under an installment contract (or who are renting). For them, any "criminal activity," committed by any member of their household anywhere "within the city limits"—and sometimes, anywhere on earth—gives the City free rein to oust the entire family. *See* page 5, above.

　　　　This case illustrates the point. If all the facts here were the same except that Jessica and Kenny had a traditional mortgage, Granite City's compulsory-eviction law would not apply. Their home is in jeopardy only by virtue of their installment contract. Like many aspiring homeowners, Jessica and Kenny have spent years making monthly payments with the aim of one

day owning their home. V. Compl. ¶¶ 53-54. But because they are too poor to qualify for a traditional mortgage, Granite City claims the power to make them homeless.

      **b.**      The City cannot possibly legitimize that distinction. In all relevant respects, Jessica and Kenny are similarly situated to someone paying off a traditional mortgage. That they cut a monthly check to Bill Campbell rather than to Wells Fargo does not make them any more responsible for Jason Lynch's crime. It does not make them any less deserving of their home. For Granite City, however, that home-financing arrangement is dispositive. Under the City's compulsory-eviction law, mortgagees are safe; people with installment contracts are not. No legitimate governmental interest can justify that distinction—and certainly not under the heightened scrutiny that secures fundamental rights. *Cf. Cook*, 126 Cal. App. 4th at 10 (Bedsworth, Acting P.J., concurring) (identifying as one of the "fundamental constitutional infirmities" in a similar law "its disparate treatment of property owners and renters"). On its face, in fact, Granite City's compulsory-eviction law suggests "a bare . . . desire to harm a politically unpopular group." *See City of Cleburne*, 473 U.S. at 447 (citation omitted). After all, the law targets not problem *properties* but problem *people*. And those people's family members. And their friends. And (as here) their friends' parents and siblings.

      Whatever the City's motives, the law is as ineffective as it is cruel. For example, Granite City appears to view Jessica and Kenny as such threats to "public safety and welfare" that they must lose their home. *See* Gedge Decl. Ex. 3, at 1. But nothing in the compulsory-eviction law would stop them from renting any other property in the City. As far as the City is concerned, they could even move next door. On top of that, the compulsory-eviction law does not apply at all to the person who triggered it—Jason Lynch. As the "lessees" of 1632 Maple Street, Jessica and Kenny must be made homeless. Granite City Mun. Code § 5.142.050(A)(3)(c). But

paradoxically, nothing in the compulsory-eviction law would stop Bill from leasing 1632 Maple Street to Jason Lynch. Put simply, kicking Jessica and Kenny's family out of their home is not in service of any legitimate public-safety interest. The predicate crime was committed by someone else. It took place someplace else. The only consequences of the City's compulsory-eviction campaign are to displace a low-income family and to visit serious costs on their landlord. V. Compl. ¶¶ 105-10. And of course, the City would be doing none of this if Jessica and Kenny had a traditional mortgage instead of a "poor man's" one.

For equal-protection purposes, that distinction is the law's cardinal sin, and it is one Granite City cannot justify. When people with mortgages commit crimes in Granite City, they get to keep their homes; when people who can't afford mortgages commit crimes, entire families are made homeless. In this way, the City's compulsory-eviction law targets the poorest members of the community in a way that is unjust, arbitrary, and divorced from any legitimate interest. Jessica and Kenny's family is not less deserving of their home because they have a leasehold interest rather than a fee simple one. As against the government, Americans have a fundamental right not to be stripped of their homes—no matter if they hold the deed themselves, or another person does, or a bank does. For that reason above all, Plaintiffs are likely to prevail under the Equal Protection Clause.[4]

**B.     The equitable factors weigh strongly in favor of a preliminary injunction.**

Preliminary relief is also warranted because "the balance of harms would weigh heavily against [Plaintiffs] if the relief were not granted." *Rhoades*, 825 F.3d at 338 (citation omitted).

---

[4] Bill Campbell has submitted a grievance to the City under Section 5.142.080 of the municipal code, V. Compl. ¶ 104, but "§ 1983 plaintiffs need not exhaust state-law remedies before asserting their federal rights," *Bradley v. Vill. of Univ. Park*, No. 16-3456, 2019 WL 3121844, at *2 (7th Cir. July 16, 2019).

### 1. *Plaintiffs face irreparable harm.*

"[T]he existence of a continuing constitutional violation" is itself "proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). The record here also confirms that Plaintiffs face grave and imminent injury. Over the past two months, Granite City has relentlessly campaigned to expel Jessica, Kenny, and their children from their home. City police have repeatedly called Bill Campbell and insisted that the family "just have to go." V. Compl. ¶ 78. A police officer confronted Jessica and announced that he was "personally" evicting her. *Id.* ¶ 92. Officers have twice appeared at her door, first to serve her with a compulsory-eviction demand and then to serve Bill. *Id.* ¶¶ 93-103. One officer warned Jessica that he intended to arrest Bill for not evicting her and her family. *Id.* ¶ 92.

These are not empty threats. To the contrary, the City has put Bill in an impossible position. Bill has no intention of evicting Jessica, Kenny, and their children for Jason Lynch's crime. *Id.* ¶¶ 80, 106-07. But if he does not, the City has threatened to arrest him and revoke his business license. *Id.* ¶¶ 92, 100. Without that license, of course, he cannot legally rent to Jessica and Kenny. Granite City Mun. Code § 5.142.020. So whatever Bill does, the City is punishing him and is pushing Jessica and Kenny toward imminent homelessness.

That "potential loss of [their] home" is a classic "irreparable harm." *Vignola v. 151 N. Kenilworth Condo. Ass'n*, No. 16-cv-713, 2016 WL 6476547, at *5 (N.D. Ill. Nov. 2, 2016) (collecting authority). And the harm is particularly acute here. Jessica and Kenny are poor. Kenny works as a forklift operator, and Jessica is struggling to find work as a housekeeper. V. Compl. ¶ 50. They have spent two years paying on their installment contract at 1632 Maple Street with the aim of finally owning their own home. *Id.* ¶¶ 53-54. If the City forces them out, they will lose that investment. Not only that, but they and their children will face homelessness. *Id.* ¶ 109. They do not have the resources to immediately rent another property. *Id.* For his part,

Bill has no other properties available. *Id.* ¶ 110. As a result, Jessica and Kenny would have little choice but to rely on charity from family. *Id.* ¶ 109; *see generally* Ramsey, *supra*, at 1197 ("[E]viction often makes it even more difficult for people, especially those without many financial resources, to find decent and affordable housing.").

These consequences are devastating at any time, but particularly now. Jessica and Kenny's three children all attend public school in Granite City and are preparing to return (two to high school, one to middle school) later this month. V. Compl. ¶ 49. The City's compulsory-eviction efforts promise to disrupt this aspect of their lives too. The family will face imminent and irreparable harm unless this Court intervenes.

### 2.   *The balance of hardships tips lopsidedly in Plaintiffs' favor.*

On the other side of the scales, a preliminary injunction would not harm the City. To begin with, "there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute." *Horina v. Granite City*, No. 05-cv-79, 2005 WL 2085119, at *3 (S.D. Ill. Aug. 29, 2005). The record reinforces that rule here. Neither Jessica, nor Kenny, nor their home had anything to do with the crime for which the City demands their ouster. In fact, Jessica and Kenny did everything right. Jessica *told the police* that Jason Lynch was in her house. V. Compl. ¶ 72. She let officers into her home. *Id.* She led them into her basement. *Id.* She showed them where Jason Lynch was hiding. *Id.* And even before learning of the City's compulsory-eviction demands, she had barred him from her home. *Id.* ¶ 76. Particularly given these circumstances, the City will suffer no harm if Jessica and Kenny stay in their home.

The State's handling of Jason Lynch—the actual perpetrator—drives home the point. Court records show that Jason Lynch pleaded guilty to the burglary charge little over a week after his arrest. Gedge Decl. Ex. 4, at 1. With the State's consent, the Madison County Circuit Court sentenced him to probation and released him back into the community. *Id.* at 1, 3. That

outcome cannot be reconciled with the City's insistence on expelling Jessica and Kenny. In the State of Illinois's view, Jason Lynch's crime did not merit any jail time at all. The City cannot possibly claim that it will be harmed if Jessica and Kenny stay in their home.

### 3.    The public interest favors a preliminary injunction.

A preliminary injunction would also be in the public interest. *See Granite City*, 2005 WL 2085119, at *10. Granite City is campaigning relentlessly to oust Jessica, Kenny, and their children from their home. To achieve its ends, the City is bringing enormous coercive pressure to bear on Bill, threatening his liberty and his livelihood. Put simply, the City has shown an unflinching disregard both for the sanctity of the home and for the rights of its most vulnerable citizens. This Court's immediate intervention is warranted.[5]

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be granted.

Dated: August 2, 2019.                    Respectfully submitted

s/Bart C. Sullivan
Bart C. Sullivan, #6198093                 Samuel B. Gedge*
FOXGALVIN, LLC                             Robert McNamara*
One South Memorial Drive, 12th Floor       INSTITUTE FOR JUSTICE
St. Louis, MO 63102                        901 North Glebe Road, Suite 900
Phone: 314.588.7000                        Arlington, VA 22203
Facsimile: 314.588.1965                    Telephone: 703.682.9320
E-mail: bsullivan@foxgalvin.com            Facsimile: 703.682.9321
                                           E-mail: sgedge@ij.org; rmcnamara@ij.org

                                           *Motions for general admission pending

---

[5] The Court has discretion to waive bond under Federal Rule of Civil Procedure 65(c) and should exercise that discretion here. Bond is inappropriate if "there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). In addition, federal courts often waive bond in civil-rights cases such as this one and—also as here—when requiring bond "would condition the exercise of plaintiffs' constitutional rights upon their financial status." *Smith v. Bd. of Election Comm'rs*, 591 F. Supp. 70, 72 (N.D. Ill. 1984).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August, 2019, a true and correct copy of the

foregoing Plaintiffs' Motion for Preliminary Injunction (along with the accompanying

declaration and exhibits) was dispatched to a third-party process server for service to the

following Defendant:

    The City of Granite City, Illinois
    c/o Mayor Ed Hagnauer/City Clerk Judy Whitaker
    2000 Edison Avenue
    Granite City, IL 62040

                                 s/Bart C. Sullivan_____
                                 Bart C. Sullivan